Thanks. Jim Hargrove, good morning. My name is Jim Hargrove. I'm here representing the appellants, River Farm Realty Trust, Paul and Linda Dorences, who are here with me in my office. I want to start by saying that the underlying dispute as to the extent of loss between my clients and the insurance company was manufactured. It was not a good faith dispute as to the extent of loss. And the facts, the underlying facts, just underscore that fact. Particularly the one where an initial estimate of $18,000 becomes a reference award of over $150,000. Stay with me on that because I understand you have the disparity of about $120,000 to $130,000 and you want us to draw an inference from that disparity that the lower figure was in bad faith. Yes. But you've also got, I mean the demand was a greater disparity. The demand of $315,000 was $180,000 off the final. So by that logic your own client's demand would be unreasonable. It seems to me that we can't infer bad faith solely from disparity where we have to have some judgment that no reasonable person would have demanded, would have offered $17,800. And where do we have that in this record? Well I think we have it at several places. First of all to understand the disparity between my client's estimates and the reference award. You have to understand that my client's estimates included over $50,000 of mold remediation for which there is only $15,000 for the coverage. So $35,000 just disappears right there because of the coverage. There's still got to be the disparity and yet I wouldn't lead to the conclusion that your client was unreasonable. They just valued things differently. They might have thought a beam had to be replaced. Someone else is a judgment call, thought a beam didn't have to be replaced. It's a $50,000 process that explains. Don't we need to know something like that that would explain? If we had an affidavit from an expert saying I'm a builder, a contractor, no reasonable person would possibly think this would be done for $18,000 then you'd be pointing us towards that evidence. I don't see anything like that in this record. Well you have to understand the composition of the reference panel. It consisted of two property adjusters. But they simply determined what they thought the amount was. They didn't determine the spectrum of reasonableness. And you need to have us find that the $17,800 was off the spectrum of reasonableness, not just different from the number picked by the referee. I think you can draw that inference just from the award. But if you couple it with the other evidence Which is what? That's my question. The delay. We'll start with that. The four month delay between notice of loss. But delay is a separate issue. I thought you were focusing on the issue of whether the amount of the award was a reasonable settlement offer. Well first of all it was not offered. The award was rendered by the panel. No, the amount. I thought you were focusing on a claim that the $18,000, $17,825 was so low that it violated 179, 176. Actually it violated checker 93A, yes. And yes, that is what we're saying. And so what evidence, other than the disparity, supports that conclusion? The fact that the insurer maintained that position, that $17,000 position, for the first year after the loss was reported. In fact, in December of 2015, when I asked the adjuster what the company's position was after my clients had submitted over $150,000 worth of estimates, the supervisor came back with the same $17,000. It wasn't until after another inspection of that the insurance company went from $17,000 to $28,000. How does that tell us anything about whether the $17,000 was on the spectrum of reasonableness? If it was and they stuck with it, how does it get off it? Well, because even there, their own independent adjuster, when they saw the $150,000 worth of estimates, looked at his own estimate of $17,000 and said, something is wrong here. That's in the email threads that are in the appendix. Okay, so there's another. And then asked for another inspection? Yes. And then after that inspection, they increased the amount of the offer again. By $10,000. What was it, $30,000? No, no, $28,000. $28,000, okay. And are you putting together the $17,000 and the $28,000? No, it came with it. $17,000 became $28,000. Are you putting together the fact that the insurer starts with a low offer and then increases it only to $28,000 after a second inspection and saying, if you look at that pattern against the award actually made, that that in and of itself establishes it's unfair? I would agree with that. No, no, I'm asking what your argument is. That is part of our argument, that the incremental minor increases over an incredibly long period of time. Well, but your clients caused a lot of that long period of time on the undisputed facts of the record. There was a period of time from June until November of 2015 when no activity on this claim took place. Right, and your client didn't immediately get back to the insurance company and say this is unreasonable. They went in, they got three, and I'm not saying they behaved unreasonably. They went in, they got three estimates and then they presented those and for the first time the insurance company learns that the $17,000 figure in their view is too low. That is true, Your Honor, however, if I may. And then there's a delay, largely occasioned by you and your clients in getting another inspector out there on behalf of the insurer appraiser, pardon me, to evaluate the damage. Well, that request was made by the insurance company, not my clients. Well, of course it was, but you didn't say come immediately. Well, actually they invited them in November of 2015 via letter to do just that when they submitted the estimates. The difficulty here, Your Honor, and I guess it would be easier if you could put yourself in my client's shoes and say was it reasonable for these things to happen in this sequence over this period of time? That's really what we're asking the court to look at. We're saying should it take 18 months to settle a homeowner's claim? Should the initial offer be only one-tenth of what is eventually awarded? To a reasonable fact finder, does this make sense? That's what we're asking the court to consider. I mean, it's enough to raise a question, but you'd like to know why it counted for the difference between the 17 and the 150. Was it plain or was it different judgment? Well, I think it was intentional, Your Honor. Well, you may think that, but there's no evidence that it was. I beg to differ. If you look at the estimates that were submitted by my clients, you will see that both the scope of loss and the cost of repair are far in excess of what the insurance company estimated. Well, but you're now back to asking us to rely on the fact. I mean, someone wants to have some work done on their house. They put it out to bid. They get three bids. The bids are $10,000, $35,000, and $87,000. Stuff like that happens all the time. Same project. Does that mean any one of the bids was in bad faith and unreasonable? No. Well, here, their bid was $17,800 and the referee's was $150,000. This is not a bid, Your Honor. You know what I mean. The offer. Two different people arrived at a different assessment of how much the work was cost. You're saying because they were so far apart, the lower one must be unreasonable. Yes. I think we are saying that. Is there any authority for it? Well, I think you have to do two things. First, you have to say, is that a reasonable basis for sending this to a jury? Okay? Or can a judge on his own say no reasonable minds could differ as to whether the difference between $17,000 and $150,000 is per se unreasonable? Without any evidence from you about what the basis for the different estimates were? Well, Your Honor, that's actually in the paper record. All the estimates that were ever created with respect to this event are in the record. No one argued to the court below that, look, if you look in the paper record of our guys, you'll see our guys said steel on the open market never sells for less than $1,000 a square foot. And they had steel at $1 a square foot. So that's just totally unreasonable. If there was something like that in the record, then you could start to say something like that. Or if you could show that they... Actually, Your Honor, we did in the brief, in the opposition to summary judgment brief, we did argue that the prices that were quoted in their estimate were nowhere near what it costs in Massachusetts to do stuff. We did argue that. The judge chose to ignore it. But we did argue it. So where in the record would we find... That would be in our opposition to their motion for summary judgment. What about the... you make the claim that the three-month original delay was unreasonable. Yeah, their own best practices say that you should have a first inspection within a week. Where does it say that? In their own best practices guidelines, which are also in the record. It's Albany Best Practices. I can probably find you a citation if you'd like. Thank you. I remember reading it, but I just forgot. Okay. And that also explains why it's per se unreasonable for an insurance company to send out an estimate in June and not contact its insured until it was contacted by them in November. They're supposed to be talking every two weeks. Isn't it plain they goofed? What's that? Isn't it... Well, you know, Your Honor, the court below said inadvertence, incompetence even, is not the subject of bad faith. It is in this blizzard of incompetence. Mr. Schneider, good morning. Good morning, Your Honor. Bill Schneider for the Applee Farm Family Casualty Insurance Company. May it please the Court. I want to focus on the two points that the Court has raised, number one being the disparity between the initial offer and the ultimate outcome in the reference award. And there is case law, Parker v. Diabolio and the Bolden v. the O'Connor Cafe cases that are cited in our papers that talk about the disparity between an offer at one point in time and the result, in those cases the result being at trial at a different point in time. And against that backdrop, it's not uncommon in a situation where there is damage to property for additional damage to be discovered or to become apparent at a later point in time. You know, an insurance company would send out an adjuster to look at the damage and maybe the adjuster has to go back and issue a supplement. I think what's important to focus on here is the fact that you've got this initial inspection and a determination about what the amount of damage is. And it shouldn't be overlooked that that inspection took place with an adjuster in the presence of the insured. And at least according to the evidence in the record, they had an agreement on what the damage was but didn't quite match up on the same page with Mr. Jorenzis indicating that he felt that the damage was worth half the value of the house or half the house was damaged. And clearly that's not reflected in the estimate. So they submit some additional estimates to the insurance company in November. And the insurance company dispatches a new adjuster because of the concerns that were raised about the initial adjuster and the initial adjuster's competence. Your opponent says there was a delay between November and March caused by you. Well, there was an estimate sent to the Jorenzis's, I believe I want to say in May or June. I don't know the exact date, Your Honor. It is in the supplemental record appendix. You know, in closing the estimate. You haven't answered the question, the delay between November. Your opponent just represented you. The insurance company was told that they could send an adjuster out and they didn't. Well, no, no, no. The record shows that once the insurance estimates came in in November, I don't dispute that there's this period of time when there's no activity taking place in the file. The insurance company is not reaching out to the policyholder. Policyholders are not reaching out to the adjuster. Okay, November to whenever the adjuster goes out. What's the explanation for that time period? Well, there is no explanation for that time period. It's a delay when, at least according, I believe, to Mr. Howard's testimony, the claim was in a holding pattern. It's not until the estimates come in. What does that mean, a holding pattern? Well, you know, Mr. Howard didn't explain it, but once the estimate went to the insurance, there was no further activity. Well, if it was a holding pattern, then I'm worried. Then it seems to me you can't, an insurance company can't put claims on a holding pattern without a reason. That sounds like bad faith. Well, there's no evidence in the record that shows that the insurance company, you know, pushed this claim off to the side. No, but we do have a delay. And we have no explanation other than that it was on a holding pattern. We have several delays. You have the delay initially at the outset of the claim. Okay, but put that aside. And you keep sort of not wanting to answer the question about the period from November when they sent the estimates to whenever it is that a new appraisal was done by the insurance company. And that's what we'd like you to answer. Oh, absolutely, Your Honor. You will see in the supplemental record appendix countless e-mails back and forth between Mr. Howard, who's the insurance company representative, and Mr. Durenzis concerning an additional inspection. You will also see several e-mails between Mr. Howard from Farm Family and Mr. Hardgrove concerning the supplemental inspection. And you will see e-mails between Mr. Grandmont, who was an independent adjuster that was hired by the insurance company to perform the supplemental inspection. So there wasn't any delay. There's active communication ongoing during this time period to set up this inspection. So when you said it was in a holding pattern, you're now saying something different, that there was a lot of communication back and forth trying to get this thing set up? Your Honor, respectfully, I was thinking about a different time period. I wasn't thinking about the period after the estimates had been submitted. What time period? Well, the original estimate from Farm Family was sent to the insurers, I believe, in May or June of 2015. It's not until November of 2015 that the insurers respond and at that point in time provide copies of the estimates that they received to the insurance company. Once the insurance company gets those estimates, Mr. Howard... So that's a six-month holding pattern there? No. Or am I wrong? June... No, so from June... After the insurance company sends the estimate in June, they don't hear from the insurers until November. Five months. Five months. Okay, I was wrong by one month. Okay. So what was the reason for the holding pattern? Once they get the estimate from the insurers in November... Excuse me, what was the reason for that holding pattern? I don't know, and it's not apparent in the record. And you have no record of the insurers having responded to your assessor's estimate... That is correct. ...during that period? That is correct. So you're waiting for the insureds to get back with their position on it? Well, yes, and that's what they do. And then once they did, they go out and they accomplish the second inspection. And I've laid it out both in the brief itself and in the record appendix. You have all the emails so you can see that this is a responsive situation where people are trying to work together. They go out, they perform the second inspection. Now, it's significant that at this second inspection, there's not only representative from the insurance company, the independent adjuster, the insured's attorney, and the insured's contractor. So, I mean, everybody who's got a say in this claim process is present for this inspection. A supplemental estimate is written. I think the replacement cost value is $36,000. The actual cash value is $28,000 at the request of my brother, Mr. Hargrove, the insurance company issued the payment. The insureds were not satisfied with that outcome, so they demanded reference. And what you'll see is that over time, for example, between the time that the insureds submitted their estimates in November of 2015, we've got a new contractor, Lincoln Barber, who comes in, who has yet another estimate for $236,000. By the time this claim goes to reference, and you've got the insured's reference briefs in the record, the dwelling claim is now $280,000. And even during the reference, as the parties were walking around, each side was noticing things that they hadn't noticed originally. The plaintiffs then amend their dwelling claim at the end of the reference. So this was never a situation where somebody could look at the damage at a point in time and say it's crystal clear, and there's no evidence of that in the record. As to the delays that they pointed out, I don't really have excuses for those. You have the correspondence that was sent by the individuals who were charged with the delay. And Farm Family, for its part, says, listen, when this claim came in, you had other open claims with our company. We screwed up. It was combined. We didn't open a new claim. We're sorry for that. And as soon as they assigned it to Mr. Howard, he jumped on it immediately. There's no evidence in the record to suggest that the delay in communication was the result of some nefarious motive or bad faith conduct. It's just not there. Similarly, with regards to the accusations about the insurance company's investigation being deficient, we said, well, what is it that the insurance company failed, refused, and neglected to consider? And that information isn't in the record because the plaintiffs in the case have never come forward with any such information to suggest that the inspections that were done weren't done in accord with standard industry customer practice or the adjuster missed this. I pointed out the roof, but the adjuster refused to look at the roof. So, you know, if there's one thing that is disputed, let's say is undisputed, it's the fact that the underlying claim and its value was disputed, and that dispute was genuine and I don't think gives rise to a triable issue as to whether or not the insurance company failed to effectuate a settlement when liability was reasonably clear. Mr. Hargrove said when he was arguing in response to one of my questions that in opposing the motion for summary judgment, he pointed to evidence in the record that would show that some of the cost factors your expert used were entirely unreasonable. I don't recall seeing that evidence in the record, Your Honor, but it's certainly beyond a declaration. I mean, these estimates are prepared utilizing computer software that dictates the price. It's not as if, you know, the adjuster gets to sit down and make up the unit cost per square foot to replace shingles. These are all predetermined. But there was never any testimony taken from the adjusters who conducted the actual inspections and who prepared the estimates to kind of ferret that out. So, you know, if it is in there, I would submit that it's more of a conclusory statement rather than something that's backed up by actual tangible evidence that the adjusters did something wrong in the calculation of their numbers that, you know, was it an inadvertent mistake? I don't know. You know, was it some intentional conduct? I don't know. But there's no evidence in the record to push it beyond the point where it would rise to the level of an unfair insurance claim settlement practice. And then, you know, just to focus on the other allegations that were made, there was an allegation that the insurance company failed to affirm or deny coverage after receiving a sworn statement of proof of loss. You know, we've provided citations to the applicable statutes and cases that talk about what a proof of loss is. And I believe it is at page 307 of the record where counsel stipulated at one of the plaintiff's depositions  So, you know, whether it's the communication issue, the clear liability issue, the investigation issue, or the proof of loss issue, as to each point, there's a failure of proof there, and that's what the district court relied on. You can't take the disparity between the initial estimate and the outcome of the reference and say that that per se gives rise to a tribal issue of fact in the absence of any evidence to show that, you know, the original estimate was the product of some shortcomings in the investigation or other unfair and deceptive conduct. What accounted for the $130,000 difference? Well, I can tell you, for example, that the insurance company, there were some issues about inspecting the roof that are discussed in the correspondence contained in the record. The parties each had roofers at the reference who went up on the roof, talked to one another, came up with an agreement about how much of it needed to be replaced and what it was going to cost. So the reference award contains their agreement as to the cost to fix the roof, which was not contained in the original estimate. And what was the roof? What was the cost of the roof? You know, I want to say like $27,000. And I don't know because we never, you know, took testimony or requested that the panel of referees explain or give a reasoned decision. They just come out with a number. So it's clear to me that, you know, they accepted some of what the plaintiffs were claiming and they did not accept other items that the plaintiffs were claiming. Exactly what factored in there beyond the roof, I don't know for sure. And then the last point I would like to make is, you know, on the issue of damages. And, you know, there is case law that talks about, well, when an insurance company does violate Chapter 176D in the conduct of its investigation or communicating with its insurers, that's really not the end of the inquiry. You have to show that that caused some damage, some separate and distinct injury or harm. And, again, none of that is apparent in the record here, particularly with regards to the, you know, initial delay in communication and also with regards to the investigation. There's just no evidence to support the plaintiff's claim. So that said, I think that the insurance company satisfied its obligations. It's paid everything that it owes under the insurance contract. And we don't think that the factual record warrants a trial on the plaintiff's claims under Chapter 93A. I ask that you affirm. Thank you. Thank you. Mr. Hargrove. Thank you. The opportunity that I'm rebuttal to address some of the statements of mine, rather. The cases that the insurer cites with respect to disparity all deal with third-party insurance cases. In other words, a dispute between a claimant and someone else's insurance company. That is not this case. This is a first-party insurance case. Is there any law that says that the duty to make a good faith offer varies depending on whether it's first- or third-party? Yes, I think there is. And I think Brantley versus U.S. Fidelity and Guarantee, 819F subsequent 101. Did you cite it in your brief? Yes. So that's the first thing, okay? The relationship between a first-party insured and its insurer is different. And so any cases that cite liability is not reasonably clear don't apply in a first-party context. Because the liability for the loss was never contested. Are you suggesting that in first-party cases a dispute about the amount of the loss is irrelevant once it is clear that the insurance company is on the hook for something? Well, I think... Yes or no? Is that your argument? No, it is not my argument. Okay. Then what is your argument? My argument is in a first-party context. That's what I asked you about. You have an insurer who has all the marbles in the bag, okay? And it's up to the insurer to determine how many of those marbles my client gets, right? And you have to, in this context, in good faith, the implied covenant of good faith and fair dealing in every contract requires that a reasonable amount of time is spent discussing a reasonable scope of loss resulting in a reasonable estimate, resulting in a reasonable agreement. If reasonableness is the test, how is that different than the third-party test, which was liability reasonably clear? Because it is not a question of liability under first-party context. Well, the damage is reasonably clear. I mean, liability for the damages. Liability for the damages was crystal clear. And they didn't deny that? They did not deny that. So the question is what's the extent of the damages? Wouldn't reasonableness be the same test to that? Well, and yes, and then would it be reasonable for an insurance company to offer the $17,000, then $28,000, and then at the very end of the reference hearing, say in no event should this insurer get more than $60,000? That is the question we wish to put before the jury. Before you sit down, can you repeat the name of that case? Yes. Brandley, B-R-A-N-D-L-E-Y. I'm sorry, what? B-R-A-N-D-L-E-Y versus U.S. Fidelity and Guarantee. V-19F sub second 101. A-19F second. 101 at 105. Thank you. If I may impose, the insurer's best practices are in the record appendix at B-165. Yes, I'm aware of that. Thank you. Thank you. Thank you.